## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| DONNA L. DAWSON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:19-cv-00388 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| KROGER LIMITED PARTNERSHIP I, | ) | By:  Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendant. | ) | |

Plaintiff Donna L. Dawson worked for Defendant Kroger Limited Partnership I ("Kroger") for over eight years, most recently as the e-Commerce Supervisor at Store No. 399 in Hardy, Virginia. Kroger fired Dawson and the male Store Manager, Frank Dawson, on December 7, 2017, following an investigation of alleged inappropriate sexual conduct in a supply closet.

On May 24, 2019, Dawson brought this action under Title VII of the Civil Rights Act, asserting claims of sex discrimination and harassment. Kroger now moves for summary judgment on both claims. The court heard oral argument on May 25, 2021, and the matter is ripe for disposition. Because Dawson has not presented evidence from which a reasonable jury could find that she was terminated on the basis of sex or subjected to a hostile work environment, the court will grant Kroger's motion for summary judgment.

## I.     BACKGROUND

The following facts are either undisputed or presented in the light most favorable to Dawson, the nonmoving party on summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Henry v. Purnell*, 652 F.3d 524, 527 (4th Cir. 2011) (en banc).

A.      **Kroger's Operating Structure and Employment Classifications**

Kroger's Mid-Atlantic Division is composed of several geographical districts, each of which encompasses approximately 18 to 20 grocery stores. (Decl. of Paul D. Wigand ¶ 3, Feb. 17, 2020 [ECF No. 67-14 at 145[1]].) At some point in 2017, Kroger realigned the Mid-Atlantic Division. (*Id.*) As part of that process, the district referred to as "District B" was renamed "District 1." (*Id.*) That district, which the court will refer to as "District B/1," includes Store No. 399 in Hardy, Virginia, where Dawson worked. (*Id.*; Dep. of Donna Dawson at 73:8–12, Feb. 18, 2020 [ECF No. 67-1].)

Each district has its own District Manager. (Wigand Decl. ¶ 4; Decl. of David Dantzler ¶ 4, Feb. 13, 2020 [ECF No. 67-14 at 159].) David Dantzler was the District Manager for District B/1 from January 2017 to June 2017. (Dantzler Decl. ¶ 4.) Paul Wigand has been the District Manager for District B/1 since June 9, 2017. (Wigand Decl. ¶ 4.)

Each district also has its own District Human Resources ("HR") Manager, who is part of Kroger's HR Department. (Decl. of Helen R. "Corri" Sensabaugh ¶ 2, Feb. 6, 2020 [ECF No. 67-14 at 89].) Corri Sensabaugh was the District HR Manager for District B/1 from February 2017 through February 2018. (*Id.*) Kroger's HR Department also includes a Total Rewards and Associate Relations Manager, who is responsible for conducting and leading HR investigations throughout the Mid-Atlantic Division. (Dep. of Erin Haithcock 9:12–21, 16:3–6, Feb. 19, 2020 [ECF No. 67-2].) Erin Haithcock held that position at all times relevant to

---

[1] ECF No. 67-14 consists of sixteen separate deposition exhibits, including several declarations. For ease of reference, the court will include the CM/ECF-assigned page number in the initial citation to any of these exhibits.

this action. (*Id.* at 9:11–13.) Both Haithcock and Sensabaugh reported to Senchal Murphy, the Division HR Leader. (*Id.* at 8:6–12.)

Employees at Store No. 399 fall into one of two categories: hourly employees and salaried managers. (Dawson Dep. 43:19–44:5.) Salaried management positions include the Store Manager, Assistant or Co-Managers, and the e-Commerce Supervisor. (Dawson Dep. at 78:24–80:7.) At all times relevant to this case, Frank Bryant was the Store Manager at Store No. 399, and Smith Brandon, David Wilson, and Jeff Blair worked as Co-Managers. (*Id.* at 78:24–79:12, 100:11, 107:12–15.) Neither the Store Manager nor the Co-Managers have the authority to hire or fire another salaried manager. (Wigand Decl. ¶ 5; Dantzler Decl. ¶ 6.) Employment decisions regarding salaried managers fall within the purview of the District Manager and the HR Department. (*Id.*)

All Kroger employees are subject to a written policy prohibiting sexual harassment in the workplace. (Def.'s Ex. N, Dep. Ex. 9 [ECF No. 67-14 at 24].) Sexual harassment is defined to include "verbal or physical conduct" that "has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." (*Id.*) An employee may be discharged for violating the policy. (*Id.*)

### B.   Dawson's Employment with Kroger

In May of 2009, Dawson began working for Kroger as a part-time, hourly employee in the Produce Department at Store No. 399. (Dawson Dep. at 72:8–20.) She transitioned to full-time employment and worked in several other departments before becoming the head of the Drug/General Merchandise Department. (*Id.* at 72:22–76:14.) All of Dawson's positions were

3

hourly until June 2017, when she was promoted to the salaried management position of e-Commerce Supervisor at Store No. 399. (*Id.* at 34:9–13, 76:23–77:5.)

District Manager David Dantzler formally offered Dawson the management position. (*Id.* at 129:13–130:13.) Dantzler determined that Dawson "was the best and most-qualified applicant for the role" and, in light of her "high potential," worked to increase her starting salary. (Dantzler Decl. ¶ 8; Dantzler Decl. Ex. B [ECF No. 67-14 at 169].)

As the e-Commerce Supervisor, Dawson managed the operation of Kroger's new online shopping system known as ClickList and supervised approximately 15 employees. (Dawson Dep. at 56:17–19, 77:3–16.) She performed exceptionally well in the position and received recognition for her achievements. (Haithcock Dep. at 90:13–15, 113:9–15.)

## C.     The Alleged "Supply-Closet Incident"

Store No. 399 has a closet on the second floor in an area reserved for employees, where supplies such as grocery bags and uniforms are stored. (Dawson Dep. at 33:10–34:8.) On Tuesday, November 21, 2017, Leslie Angle, a part-time hourly employee, "reported walking in on [Dawson and Frank] Bryant in the store supply closet . . . and observing the two of [them] engaged in inappropriate sexual activity." (*Id.* at 31:24–32:5.) Angle initially disclosed the alleged incident to her supervisor, Nicole Hackett, and a coworker, Sandy Nicely. (Dep. of Leslie Angle at 25:2–26:16, Feb. 20, 2020 [ECF No. 67-4]; Dep. of Cassandra "Nicole" Hackett at 12:13–13:17, Oct. 20, 2020 [ECF No. 67-7]; Dep. of Sandy Nicely at 19:4–20:21, Dec. 9, 2020 [ECF No. 67-9].)

4

On Friday, November 24, 2017, the day after Thanksgiving, Angle drafted a handwritten statement at the request of Co-Manager Smith Brandon. (Angle Dep. at 40:2-41:3.) The statement reads, in part, as follows:

> I was asked to go get a banker box from the storage room in the upstairs hallway. When I opened the door the light was on and I slammed the door into Mr. Bryant's back not knowing he was in the room. When he turned around his belt was undone and his pants were partly off. I could also see another person in the room, which was Donna Dawson. He very quickly slammed the door and said he would be out in a minute so I waited outside the door. He opened it again and realized I was still there so he asked what I needed. I told him a banker box, he got it, handed it to me, and I walked away. I was completely stunned by what I just saw and wasn't sure what to do. Not even a minute later he walked up behind me in the conference room like he was afraid I was going to say something. The rest of the day I couldn't look at either of them, especially Mr. Bryant, the person in charge of me. When I was leaving that day (11/21) I had already clocked out and was standing next to Nicole's desk talking to her and Sandy. He walked up and joined in on the conversation. He asked me if I wanted to work tomorrow (11/22). I told him I can't I already had 40 hours and I know we are not supposed to have overtime. He said it was okay that I could work anyway and asked me what hours that I would want to work. I asked if 9am-5pm was okay and he said yes. He then told Nicole, "There's some extra help for tomorrow now you can't fail" . . . .
>
> [On November 22,] I clocked in that morning and walked over to Nicole's desk just to say hi. He came up to me and said, "Come on, you're mine today, you're working in grocery." Nothing was said the day before about me working in grocery. I felt so uncomfortable by that statement and didn't know what to do. I did not want to be alone with him so I ran down the stairs really fast to Aisle 7 where he told me to go. Before I could get down there, Nicole and Sandy could see how uncomfortable I felt and that I didn't want to go down there with him, so they paged me to come to accounting. After that they both, Nicole and Sandy, stayed with me all day. When Nicole had left, Sandy and I came upstairs to eat lunch. He came up to me then and asked if I had gotten all the totes done in grocery that he told me to do, that it was my responsibility to get all of them done before I left . . . .

> After Sandy left at 3 pm, I was by myself for the next two hours
> until 5 pm. I was so afraid that Mr. Bryant was going to come try
> and say something to me I locked myself in accounting doing
> change machines . . . . I felt on edge all day and at one point
> thought I was going to break down I was so paniced [sic]. He
> finally left around 4 pm and I could finally relax.

(Def.'s Ex. N, Dep. Ex. 27 [ECF No. 67-14 at 85].)

## D.     The HR Investigation

Kroger's HR Department first learned about the alleged "supply-closet incident" on

November 24, 2017, when Smith Brandon spoke to Corri Sensabaugh and provided her with

Leslie Angle's written statement. (Dep. of Smith Brandon at 9:15–17, 10:11–16, Dec. 10, 2020

[ECF No. 67-12]; Sensabaugh Decl. ¶¶ 9, 20.) Sensabaugh brought the matter to Erin

Haithcock's attention, and Haithcock directed Sensabaugh to conduct an investigation and

speak with associates at the store. (Haithcock Dep. at 15:21–24; Sensabaugh Dep. at 24:6–8.)

Sensabaugh began her investigation on November 27, 2017, and completed her

investigation on November 30, 2017. (Sensabaugh Decl. ¶ 10.) During her investigation,

Sensabaugh interviewed seven employees: Leslie Angle, Tiffani Brown, Smith Brandon,

Nicole Hackett, Dawn Pallente, Sandy Nicely, and Chrystal Stacey. (Def.'s Ex. N, Dep. Ex. 12

[ECF No. 67-14 at 28].) At Haithcock's direction, Sensabaugh did not interview Dawson or

Bryant because Haithcock planned to speak with them herself. (Sensabaugh Dep. at 45:10–

46:18.)

Sensabaugh prepared an investigative report summarizing the information provided

during each of the employee interviews. (*See* Def.'s Ex. N, Dep. Ex. 12.) According to the

report, Angle described what she had purportedly observed in the supply closet, and several

of the other employees shared what they had heard from Angle regarding the alleged incident.

The report indicates that Dawson and Bryant were described as being "giggly," "really close," and "a little too friendly" with one another, and that several employees reported having heard rumors regarding their relationship. (*Id.* at 28, 30, 37[2] (internal quotation marks omitted).) For instance, the report includes the following bullet points from Tiffani Brown's interview:

- Associates became [sic] coming to her and communicating allegations of Frank Bryant and Donna Dawson's relationship along with general store issues beginning on "day one [of training in store]"; "they must have felt comfortable coming to me and talking to me"
- "a lot of people talked about their [Frank and Donna's] relationship being uncomfortable…people have said that's how she [Donna] moved up the ladder [from Front-End Clerk >Kitchen Place > Drug/GM Manager > ClickList Supervisor]"
  - When asked who has made these comments, Tiffani mentioned the following associates: Dawn Pallente, AJ Hoover, Nicole Hackett and Smith Brandon
- Stated that she had asked David Wilson and Jeff Blair if they were aware and Wilson stated "that's been going on since I got here"
  . . . .
- Mentioned that she was not a witness however, was told by Nicole Hackett (witness) that Donna had her hand on Frank's leg/knee in a Monday Board Meeting.
  . . . .
- Explained that Smith Brandon shared with her that he had heard rumors . . . .

(*Id.* at 28–29 (alterations in original).) The report indicates that other employees reported hearing rumors that Dawson and Bryant had been engaging in sexual activity at the store; that they were in a relationship; and that Dawson had been observed with her hand on Bryant's leg during a meeting. (*Id.* at 28, 30, 32, 33, 37.) While Nicole Hackett indicated that she had not heard any rumors until after Angle reported seeing Dawson and Bryant in the supply closet,

---

[2] The page numbers in the court's citations to the investigative report refer to those assigned by the CM/ECF system.

Smith Brandon reported that rumors had been circulating regarding the pair's relationship since Dawson became the e-Commerce Supervisor. (*Id.* at 32, 34.)

The report also indicates that Bryant unexpectedly approached Sensabaugh on November 30, 2017, while she was speaking with Tiffani Brown. (*Id.* at 35.) According to the report, Bryant asked several times what he needed to do and mentioned that "rumors had gotten out of hand." (*Id.*) Bryant also requested to see Angle's written statement and remarked that he was being targeted by Kroger. (*Id.* at 36.)

In addition to conducting employee interviews, Sensabaugh reviewed time-stamped video footage from the store's surveillance cameras. Her investigative report indicates that there were no cameras positioned toward the supply closet or the management offices. (*Id.* at 39.) The report includes descriptions of footage from the break room and the accounting office. (*Id.*) The report also includes a "Timeline of Events" based on the employee interviews and available video footage. (*Id.* at 38.)

Sensabaugh forwarded the investigative report and Angle's written statement to Erin Haithcock. (Sensabaugh Decl. ¶ 29.) Haithcock reviewed the report and asked Paul Wigand to schedule separate meetings with Dawson and Bryant. (Haithcock Dep. at 123:14–17; Wigand Decl. ¶ 9.) Haithcock also asked Sensabaugh to obtain written statements from the employees who were interviewed. (Sensabaugh Decl. ¶ 30.) On or about December 3, 2017, Wigand called Dawson and Bryant and asked each of them to report to the Mid-Atlantic Divisional Office for a meeting with Haithcock and Senchal Murphy. (Wigand Decl. ¶ 9.)

Dawson met with Haithcock and Murphy on December 4, 2017. (Dawson Dep. at 155:17 –24.) During the meeting, Haithcock asked Dawson to identify "the first time [Dawson

and Bryant] had sex in the store." (Haithcock Dep. at 58:13–16.) In response, Dawson "said that they never had." (*Id.* at 58:21.) Haithcock also asked Dawson whether she had ever reached over and grabbed Bryant's leg during a meeting, whether Bryant had ever looked at her in a manner that made her feel uncomfortable, and why she was in the supply closet on the day in question. (Dawson Dep. at 156:20–157:20.) Haithcock advised Dawson that Kroger had "sworn statements and video evidence" indicating that Dawson and Bryant were involved in an inappropriate relationship. (*Id.* at 157:21–23.) Dawson denied the allegations and asserted that Haithcock "had no video evidence of [her] being inappropriate with Mr. Bryant or any other man at that store." (*Id.* at 161:11–13.) Dawson further asserted that "Leslie Angle was making it up." (Haithcock Dep. at 110:5–8.)

Although Haithcock asked the majority of the questions during the meeting, Senchal Murphy posed at least one question to Dawson. (Dawson Dep. at 156:2–8.) When Dawson mentioned that she had been happily married for 32 years, Murphy responded by asking how she felt "having to go home and tell [her] husband that [she was] having an inappropriate relationship with Frank Bryant." (*Id.* at 156:8–13.) Dawson advised Murphy that she would have no problem speaking to her husband. (*Id.* at 156:14–17.)

That same day, Haithcock and Murphy met with Bryant at the Mid-Atlantic Divisional Office. (Dep. of Frank Bryant at 25:22–25, Dec. 8, 2020 [ECF No. 70].) In response to a series of questions from Haithcock, Bryant denied having ever engaged in any type of sexual contact with Dawson. (*Id.* at 26:8–12.) Bryant also denied that Dawson had ever put her hands on his knee during a meeting. (*Id.* at 26:19–23.)

At the conclusion of the meetings, Haithcock suspended Dawson and Bryant pending the completion of the HR investigation. (*Id.* at 27:4–7.) Haithcock then called Leslie Angle and conducted a follow-up interview. (Haithcock Dep. at 110:9–12.) She also reviewed the video footage obtained by Sensabaugh. (*Id.* at 51:6–10.) A portion of the footage showed Angle talking to Sandy Nicely following the alleged incident in the supply closet. (*Id.* at 78:6–18.) Haithcock interpreted their physical expressions as indications of "an emotional reaction to something." (*Id.* at 80:14–18.)

Haithcock ultimately decided to "believe Leslie Angle and not Donna Dawson" or Frank Bryant. (*Id.* at 49:4–5.) At her deposition, Haithcock provided the following explanation for that decision:

> I believed Leslie Angle because of what she stated that she saw, because of the reaction that she had after she saw what she saw, because of what witnesses stated she said and did after she saw what she saw, because of Frank coming into the conference room directly after and what happened there, because he then randomly offered a part-time cashier, on the same day as the incident, overtime before other department heads, leads, back-ups and other key people in the store for the very next day, that outnumbered the amount of overtime hours that any of those people have, that there was an attempt to interfere with the investigation as Corri [Sensabaugh] was asking people questions. And those are the factors as to why I believed Leslie Angle, in part.

(*Id.* at 49:6–20.)

## E.   Termination of Dawson and Bryant

On December 7, 2017, Haithcock met separately with Dawson and Bryant and informed them that they were being terminated, effective immediately. (Dawson Dep. at 153:19–154:13; Bryant Dep. at 24:9–21.) During her deposition, Haithcock testified that she

was the "sole decision-maker" and that no one else was involved in the decision-making process. (Haithcock Dep. at 108:24–109:4.) She further testified that Dawson and Bryant were both fired "[f]or engaging in inappropriate conduct in violation of [Kroger's] sexual harassment policy." (*Id.* at 51:13–17.) When asked to identify the inappropriate conduct, Haithcock testified that Dawson and Bryant "engaged in inappropriate sexual conduct at the workplace in violation of the sexual harassment policy." (*Id.* at 52:5–7.)

Later at her deposition, plaintiff's counsel read Haithcock the portion of Sensabaugh's investigative report that summarized the information provided by Angle. (*Id.* at 85:16– 87:11.) When asked if it was correct that "Angle saw no sexual activity" and instead merely "inferred sexual activity," Haithcock responded as follows:

> A.   If a man has his belt and his pants undone in a room with another person, another woman, then that is sexual activity.
>
> Q.   That's proof of sexual activity, at least in your mind?
>
> A.   Correct, yes, sir.
>
> Q.   And it couldn't be proof of anything else?
>
> A.   No, sir, not in my mind.

(*Id.* at 86:23–87:7.)

In response to additional questions, Haithcock testified that Dawson and Bryant were both salaried managers; that she did not treat either employee differently than the other; and that she did not consider either employee's sex or gender when making her decisions. (*Id.* at 112:12–113:8.) Haithcock further testified that she did not consider the rumors about Dawson and Bryant in deciding to terminate both employees. (*Id.* at 111:9–112:8.) Haithcock stated

that she was only "concerned about the incident that took place on November the 21st." (*Id.* at 60:8–9; *see also id.* at 57:23–24.)

## F.     Additional Evidence Regarding the Workplace Rumors

As part of her discovery responses, Dawson produced an unsigned and undated anonymous letter regarding Dawson, Bryant, and the rumors regarding their relationship. (Def.'s Ex. N, Dep. Ex. 13 [ECF No. 67-14 at 41].) The letter indicates that "[t]here had been mild rumors that started back when Mrs. Dawson took over [ClickList] that she must be sleeping with Mr. Bryant because she got that position which was collectively started by Dawn Pallente and Sandy Nicely." (*Id.*) According to the letter, Pallente and Nicely "kept saying how could someone as unqualified end up with that job unless they were sleeping with the boss." (*Id.*)

A few months after her termination, Dawson received the anonymous letter from one of her former coworkers, Melody Scoggins. (Dawson Dep. at 114:18–115:24.) Dawson then forwarded the letter to her attorney. (*Id.* at 116:6–8; *see also* Def.'s Ex. N, Dep. Ex. 34 [ECF No. 67-14 at 185].) When deposed, Scoggins testified that she wrote the letter because she believed that Kroger had treated Dawson unfairly. (Dep. of Melody Scoggins at 10:6–18, Dec. 10, 2020 [ECF No. 67-11].) Scoggins also testified that the "main time" she heard the rumors about Dawson having an inappropriate relationship with Bryant "was after all of this happened" and that the rumors "came out of the mouths of people like Dawn [Pallente] and Sandy [Nicely] and Nicole [Hackett]." (*Id.* at 11:18–12:3.)

For her part, Dawson testified that she was not aware of the rumors regarding her purported relationship with Bryant until "the week after Thanksgiving in 2017" or "until after

12

[she] didn't have a job with Kroger." (Dawson Dep. at 121:24–122:4, 124:2–5, 125:13–14.) Thus, Dawson acknowledged that the rumors did not affect her job performance while she was employed by Kroger or "have any sort of adverse impact" on her position. (*Id.* at 124:21–125:8.)

## G.    Dawson's Replacement

Following Dawson's termination, Richard Gusler, "stepped up and assumed the role" of e-Commerce Supervisor. (*Id.* at 103:9–13.) Gusler was "the highest level person that [Dawson] supervised," and she had previously "named him as [her] back-up." (*Id.* at 56:20–57:2.) Gusler continued to handle the duties and responsibilities until the District Manager promoted an hourly employee, Rebeccah Narum, to the position. (Wigand Decl. ¶ 18.)

## H.    Subsequent Communications and Proceedings

On December 28, 2017, Dawson sent Kroger a letter asserting that she had been terminated on the basis of false allegations. (Def.'s Ex. N, Dep. Ex. 26 [ECF No. 67-14 at 81].) Dawson asked that Kroger "reinstate" her "with a full award of back pay and benefits as quickly as possible." (*Id.*) During her deposition, Dawson explained that she enjoyed working at Kroger and that she wanted to continue doing so, despite the rumors regarding her relationship with Bryant. (Dawson Dep. at 205:12–206:18.)

Dawson also applied for and received unemployment benefits through the Virginia Employment Commission ("VEC"). (Def.'s Ex. N, Dep. Ex. 18 [ECF No. 67-14 at 78].) Kroger initially appealed the decision on the basis that Dawson "was discharged for unacceptable and improper conduct." (*Id.*) After Dawson arrived for the appeal hearing,

however, a VEC officer advised her that Kroger had elected to withdraw the appeal. (Dawson Dep. at 176:13–177:4.)

On April 27, 2018, Dawson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Kroger discriminated against her on the basis of sex. (Def.'s Ex. N, Dep. Ex. 1 [ECF No. 67-14 at 3].) Dawson asserted that she was terminated for allegedly having sex with the Store Manager; that she never had sex with the Store Manager at the store or anywhere else; that she was replaced by a male employee after being terminated; and that Kroger "continued to harass her" following her termination by dropping the VEC appeal at the last minute. (*Id.*)

After receiving a right-to-sue letter from the EEOC, Dawson filed this action on May 24, 2019. The case is presently before the court on Kroger's motion for summary judgment.

## II.   SUMMARY JUDGMENT STANDARD

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248–49).

When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam). To withstand a summary judgment motion, the nonmoving party must produce

sufficient evidence from which a reasonable jury could return a verdict in her favor. *Anderson*, 477 U.S. at 248. "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case." *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (internal quotation marks and citation omitted).

### III.   ANALYSIS

Dawson's single-count complaint asserts a "claim for sex discrimination and harassment." (Compl. at 5, ECF No. 1.) Kroger construed the complaint to assert two distinct causes of action under Title VII: discriminatory discharge and hostile work environment. Kroger has moved for summary judgment on both claims.

### A.   Discriminatory Discharge

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court recently explained that "Title VII's 'because of' test incorporates the simple and traditional standard of but-for causation," which is "established whenever a particular outcome would not have happened but for the purported cause." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020) (additional internal quotation marks and citations omitted). Under this standard, an employee's sex need not be the only factor that contributed to an adverse employment decision. *Id.* "If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred." *Id.* at 1741.

A plaintiff has two potential avenues to avoid summary judgment on a claim of intentional sex discrimination. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nasser*, 570 U.S. 338 (2013). First, a plaintiff may utilize the mixed-motive framework and "establish a claim of discrimination by demonstrating through direct or circumstantial evidence that sex . . . discrimination motivated the employer's adverse employment decision." *Id.* Second, a plaintiff may rely on the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* at 285. In this case, Dawson makes arguments under both frameworks, which the court will address in turn.

### 1.    Mixed-Motive Framework

To survive summary judgment under the mixed-motive method of proof, a plaintiff must present sufficient direct or circumstantial evidence for a reasonable jury to find that a protected trait such as sex motivated the employer's adverse employment decision. *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). "At a minimum, to pursue a mixed-motive case, a plaintiff must demonstrate that a 'protected trait . . . actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.'" *Worden v. SunTrust Banks, Inc.*, 549 F.3d 334, 342 n.7 (4th Cir. 2008) (alteration in original) (quoting *Hill*, 354 F.3d at 286). The plaintiff "need not demonstrate that the prohibited characteristic was the sole motivating factor to prevail, so long as it was a motivating factor." *Hill*, 354 F.3d at 284.

### a.   Direct Evidence

Dawson first argues that she has presented direct evidence demonstrating that sex motivated the decision to terminate her employment. She specifically relies on the following exchange during Erin Haithcock's deposition, placing particular emphasis on Haithcock's use of the terms "man" and "woman":

Q    And so Leslie Angle saw no sexual activity, she inferred sexual activity, correct?

A    **If a <u>man</u> has his belt and his pants undone in a room with another person, another <u>woman</u>, then that is sexual activity.**

Q    That's proof of sexual activity, at least in your mind?

A    Correct, yes, sir.

Q    And it couldn't be proof of anything else?

A    No, sir, not in my mind.

(Pl.'s Br. Opp'n Summ. J. 18 [ECF No. 72] (emphasis added by plaintiff) (quoting Haithcock Dep. at 86:21–87:7).) Dawson argues that the highlighted testimony is a "confession of liability," particularly in light of *Bostock*. (*Id.*) For the following reasons, however, the court is unpersuaded.

The United States Court of Appeals for the Fourth Circuit has defined direct evidence of discrimination as "evidence of conduct or statements that both reflect directly the discriminatory attitude and that bear directly on the contested employment decision." *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc) (internal quotation marks and citations omitted). Stated differently, the plaintiff "must produce evidence that clearly indicates a discriminatory attitude at the workplace and must illustrate a nexus between that negative

17

attitude and the employment action." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101–02 (2003). "Such unaided proof may consist of . . . evidence that the employer announced, or admitted, or otherwise unmistakably indicated that [a protected trait] was a determining factor" in the challenged employment decision. *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982); *see also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) ("Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.") (internal quotation marks and citation omitted). "Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (citations omitted); *see also Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (explaining that "if the content and context of a statement allow it to be plausibly interpreted in two different ways—one discriminatory and the other benign—the statement does not qualify as direct evidence"). The same is true for statements that "require an inference" of discrimination. *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 581 (5th Cir. 2020).

Kroger correctly argues that the deposition testimony cited by Dawson does not constitute direct evidence of discrimination. The testimony does not clearly reflect a discriminatory attitude or unmistakably indicate that Dawson's sex was a motivating factor in the decision to terminate her employment. While Dawson places great emphasis on Haithcock's reference to "another woman," she ignores the fact that it was preceded by "another person": "If a man has his belt and his pants undone in a room with *another person*,

another woman, then that it is sexual activity." (Haithcock Dep. at 86:23-87:1) (emphasis added).) When read in its entirety, Haithcock's testimony does not "suggest discriminatory animus without resorting to speculation," *Takele v. Mayo Clinic*, 576 F.3d 834, 839 (8th Cir. 2009), much less "require[] the conclusion" that Dawson's sex played a role in the decision to terminate her employment, *Wexler*, 317 F.3d 570. Accordingly, it is not direct evidence of intentional sex discrimination.

Nor does Haithcock's testimony constitute an admission of liability in light of the Supreme Court's decision in *Bostock*. In *Bostock*, the Court granted certiorari to resolve "the disagreement among courts of appeals over the scope of Title VII's protections for homosexual and transgender persons." 140 S. Ct. at 1738. In each of the cases before the Court, the employer undisputedly fired an employee for being homosexual or transgender. *Id.* at 1744. The "only question" before the Court was "whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" *Id.* at 1753. The Court found the answer to be "clear": "An employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex." *Id.* at 1737. In other words, "changing the employee's sex would [yield] a different choice by the employer." *Id.* at 1741. Because sex "plays a necessary and undisguisable role in the decision," the employer violates Title VII. *Id.*; *see also id.* at 175 ("An employer who fires an individual merely for being gay or transgender defies the law.").

Although Dawson was not fired for being homosexual or transgender, she argues that the same reasoning applies in this case because "a reasonable jury could find that changing

[her] sex would have indeed yielded a different employment decision." (Pl.'s Br. Opp'n Summ. J. 19.) More specifically, Dawson contends that if she "had been a male employee who happened to have been in the supply closet . . . with Frank Bryant who (*allegedly*) had his pants unzipped," Kroger "would *not* have seen such as proof *per se* that the two were engaging in sexual activity and would have come to a decision other than terminating plaintiff." (*Id.* (emphasis in original).) Once again, however, Dawson's argument is based on a selective reading of Haithcock's deposition testimony—specifically one that ignores the phrase "another person"—and requires the type of speculation that is insufficient to survive summary judgment. The cited testimony simply does not support the conclusion that "changing [Dawson's] sex would have yielded a different choice" by Kroger or that Kroger terminated Dawson for "actions it would not have questioned in members of a different sex." *Bostock*, 140 S. Ct. at 1740–41. Accordingly, it is not evidence from which a reasonable jury could find that Kroger engaged in intentional sex discrimination, much less an admission of liability under *Bostock*.

        **b.**    **Circumstantial Evidence**

Dawson also contends that she has presented sufficient circumstantial evidence to survive summary judgment under the mixed-motive framework. Circumstantial evidence of discrimination is evidence that "allows the trier of fact to *infer* intentional discrimination by the decisionmaker." *Rudin v. Lincoln Land Cmty. College*, 420 F.3d 712, 720 (7th Cir. 2005) (emphasis in original) (internal quotation marks and citation omitted). "While a plaintiff may present circumstantial evidence to support [a] claim of discrimination, unsupported speculation is insufficient to defeat a motion for summary judgment." *Jones v. Dole Food Co.*,

827 F. Supp. 2d 532, 546 (W.D.N.C. 2011); *see also Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 521 (4th Cir. 2006) (observing that pure speculation cannot create an inference of illegal discrimination). The court concludes that the evidence cited by Dawson does not support an inference of intentional sex discrimination.

### i. Workplace Rumors

Dawson first points to the evidence of workplace rumors regarding her relationship with Bryant. Dawson argues that "rumors of [her] sleeping with Frank Bryant to get promoted were rampant in the workplace well before Leslie Angle ever claimed to have witnessed [them] in the supply closet together" and that a reasonable jury could find that, but for the "sex-based" rumors, Kroger would not have terminated her employment. (Pl.'s Br. Opp'n Summ. J. 21–22.) This argument misconstrues the undisputed factual record and existing law on the effect of workplace rumors.

To support this argument, Dawson relies heavily on the Fourth Circuit's decision in *Parker v. Reema Consulting Services, Inc.*, in which the Court considered "whether a false rumor that a female employee slept with her mail boss to obtain promotion can ever give rise to her employer's liability under Title VII for discrimination 'because of sex.'" 915 F.3d 297, 299–300 (4th Cir. 2019). The Court concluded that the factual allegations in the case before it, where the employer was "charged with participating in the circulation of the rumor and acting on it by sanctioning the employee, do implicate such liability." *Id.* at 300.

A review of the factual allegations in *Parker* reveals that they are readily distinguishable from the facts of this case. In *Parker*, male employees started a rumor that "Parker, a female subordinate, had sex with her male superior to obtain promotion, implying that Parker used

her womanhood, rather than her merit, to obtain from a man, so seduced, a promotion." *Id.*
at 303-04. "The complaint not only invoke[d] by reference this sexual stereotype," it also
specifically alleged that the highest-ranking manager participated in spreading the rumor; that
he solely excluded Parker from an all-staff meeting at which the rumor was discussed; that he
blamed Parker for the rumor and suggested that she should be terminated for complaining
about it; and that he also told Parker that he could no longer recommend her for promotions
because of the rumor. *Id.* at 300, 303. The complaint further alleged that Parker's employment
was terminated because of the rumor and that "Parker as the female member of the rumored
sexual relationship was sanctioned, but [Demarcus] Pickett as the male member was not." *Id.*
at 303. Based on these allegations, the Fourth Circuit concluded that the complaint "plausibly
alleged that Parker suffered harassment because she was a woman" and that the district court
erred in reaching a contrary conclusion with respect to her hostile work environment claim.[3]
*Id.*

On remand, the employer moved for summary judgment on the hostile work
environment claim, once again arguing that Parker had not demonstrated that the harassment
was based on her sex. *Parker v. Reema Consulting Servs., Inc.*, No. 8:17-cv-01648, 2021 WL
1967373, at *8 (D. Md. May 17, 2021). The district court rejected this argument, emphasizing
that "the record establishes that Pickett, the other primary target of the rumor, did not
experience the type of harassment faced by Parker," that the highest-ranking manager "did
not shout at Pickett" or "seek to have him fired," and that there was "also no evidence that

---

[3] Although Parker also asserted a discriminatory discharge claim, the Fourth Circuit affirmed the dismissal of
that claim for failure to exhaust administrative remedies. *Parker*, 915 F.3d at 306.

Pickett encountered the type of hostility and ridicule from subordinates . . . that Parker experienced." *Id.* Thus, the district court found that "the evidence supports the conclusion that of the various individuals in these events, only Parker, the female manager targeted by the rumor, endured hostility from [the highest-ranking manager] and subordinates and was punished with termination." *Id.*

Here, the facts are clearly distinguishable. There is no evidence that Dawson, her District Managers, or anyone in Kroger's HR Department had knowledge of the rumors regarding Dawson and Bryant until after Angle reported seeing them in the supply closet. Although the investigation of that alleged incident revealed that Co-Manager Smith Brandon was aware of the rumors and may have participated in circulating them, there is no evidence that Brandon or any other salaried managers "harangued" Dawson about the rumors or suggested that Dawson should be sanctioned because of them. *Parker*, 915 F.3d at 304. Indeed, Dawson herself conceded that she was not aware of the rumors until "the week after Thanksgiving in 2017" or "until after [she] didn't have a job with Kroger." (*Id.* at 124:2–5, 125:13–14.) And Dawson acknowledged that her belief that she was "terminated based on false rumors . . . is really just speculation and conjecture on [her] part." (Dawson Dep. at 171:23– 172:6.) Additionally, it is undisputed that Dawson and Bryant were both terminated following the investigation of the alleged incident in the supply closet. (*Id.* at 172:17–19). Thus, this is not a case in which "the female member of the rumored sexual relationship was sanctioned, but . . . the male member was not." *Parker*, 915 F.3d at 303.

Given these distinctions, the court finds Dawson's reliance on *Parker* unpersuasive. Although this case involves rumors of a similar nature, no reasonable jury could find from the

rumor evidence that Dawson was *terminated* "because she was a woman." *Id.* Accordingly, the evidence is insufficient to survive summary judgment on the claim of discriminatory discharge.

### ii.    The HR Investigation

Dawson also argues that "Kroger's woefully inadequate investigation provides further evidence of sex discrimination." (Pl.'s Br. Opp'n Summ. J. 26.) Dawson bases this argument on the assertion that Kroger "purposefully did not interview [her] or Bryant." (*Id.*)

Courts have recognized that "evidence of an obviously inadequate investigation into [an] employee's misconduct could tend to show that claimed employee misconduct was actually a pretext for prohibited animus." *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 905 (4th Cir. 2017) (citing *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542 (10th Cir. 2014)). "But an employer may ordinarily 'defeat the inference' . . . stemming from an allegedly unfair investigation by 'simply asking an employee for his [or her] version of events.'" *DeWitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1314 (10th Cir. 2017) (quoting *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 488 (10th Cir. 2006)); *see also Estate of Bassatt v. Sch. Dist. No. 1*, 775 F.3d 1233, 1240 (10th Cir. 2014) ("While the Estate relies on *Smothers* [to support the argument that the principal inadequately investigated the incident], there the employer never heard the plaintiff's side of the story before firing him. That is not the case here. [The principal] heard both [employees'] accounts of what happened and had to make a decision.") (citation omitted).

In this case, it is undisputed that Dawson and Bryant met separately with Erin Haithcock and Senchal Murphy on December 4, 2017, three days before their terminations. Regardless of whether their encounters with Haithcock and Murphy are characterized as meetings or interviews, Dawson acknowledged at her deposition that she was "able to provide

whatever sort of information [she] wanted . . . during that meeting." (Dawson Dep. at 165:11–15). Dawson also acknowledged that she had the opportunity to answer any questions and to provide the same explanations that she provided during her deposition. (*Id.* at 163:10–17.) The fact that Haithcock and Murphy allowed Dawson to provide her side of the story "defeats any inference of an unfair investigation." *DeWitt*, 845 F.3d at 1314.

Additionally, and more fundamentally, Title VII "does not ensure against inaccuracy by an employer, only against gender-based discrimination." *Rosado v. Radio Shack, Inc.*, 312 F.3d 532, 535 (1st Cir. 2002). Therefore, "focusing on the quality of internal investigations misses the point." *Cupples v. AmSan, LLC*, 282 F. App'x 205, 210 (4th Cir. 2008). Even if the HR investigation was subpar, Dawson's criticisms do not give rise to a reasonable inference that her sex was a motivating factor in the decision to terminate her employment. *Id.*; *see also Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011).

### iii.   Dawson's Replacement

Finally, the fact that Richard Gusler performed Dawson's job duties immediately following her termination does not support a reasonable inference of sex discrimination. The record reveals that Gusler temporarily assumed the role of e-Commerce Supervisor until the position was permanently filled by Rebeccah Narum, a female employee. Courts have held that the temporary replacement of a plaintiff by an employee outside her protected class "is insufficient, standing alone, to give rise to an inference of discrimination." *Nash v. Optomec, Inc.*, 185 F. Supp. 3d 1129, 1135 (D. Minn. 2016) (internal quotation marks and citations omitted). This is especially true in a case such as this, where the temporary replacement was already serving as the plaintiff's "back-up." (Dawson Dep. at 56:23–57:2, 103:7–8.) Therefore,

regardless of whether Gusler or Narum actually replaced Dawson, the evidence does not create an inference of discrimination.

For these reasons, there is no direct or circumstantial evidence from which a jury could reasonably find that Dawson's sex had a determinative influence on the decision to terminate her employment. Accordingly, Dawson's claim of discriminatory discharge does not survive summary judgment under the mixed-motive framework.

### 2.    Burden-Shifting Framework

Dawson alternatively argues that she has proffered sufficient evidence to survive summary judgment under the *McDonnell Douglas* burden-shifting framework. Under this scheme of proof, the plaintiff bears the initial burden of establishing a prima facie case of sex discrimination. *Abilt v. Cent. Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). "If the plaintiff succeeds, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions." *Id.* If the defendant satisfies this requirement, "the burden shifts back to the plaintiff to 'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 405 U.S 248, 253 (1981)).

### a.    Prima Facie Case

To establish a prima facie case of sex discrimination, "a plaintiff must show: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action . . . ; and (4) that similarly-situated employees outside the protected class received more favorable treatment." *Gerner v. Cnty. of Chesterfield*, 674 F.3d 264, 266 (4th Cir. 2012) (internal

quotation marks and citation omitted). Although Dawson satisfies the first three prongs, her prima facie case falters on the fourth.

Under the fourth prong, a plaintiff must identify an employee (or employees) outside the protected class and "provide evidence that the proposed comparators are not just similar in *some* respects, but similarly-situated *in all respects*." *Davis v. Town of Tazewell*, 834 F. App'x 7, 8 (4th Cir. 2021) (per curiam) (quoting *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir.), *cert. denied*, 140 S. Ct. 381 (2019)). The similarly-situated requirement "promotes the goals of Title VII by helping to identify discrimination." *Tinsley v. City of Charlotte*, No. 19-1871, 2021 WL 1783226, at *5 (4th Cir. May 5, 2021); *see also Laing v. Fed. Express Corp.*, 703 F.3d 713, 719 (4th Cir. 2013) (noting that "the very term 'discrimination' invokes the notion of treating two persons differently on the basis of a certain characteristic"). A female plaintiff can demonstrate that a male comparator is similarly situated by showing that they (1) "dealt with the same supervisor," and (2) were "subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019). Although a comparator's conduct need not be identical, it must be similar enough to prevent courts from "confusing apples with oranges." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (internal quotation marks and citation omitted).

Dawson attempts to satisfy the fourth prong by suggesting that "[a]ll male employees who have been in a room with Frank Bryant or any other male employee—whether sitting or standing—engaged in the same exact conduct as plaintiff and yet were not terminated for sexual misconduct." (Pl.'s Br. Opp'n Summ. J. 29.) This argument is unpersuasive. Dawson

was not terminated for merely being in the supply closet with Bryant; she was terminated after an employee reported witnessing inappropriate sexual conduct. Therefore, other male employees (aside from Bryant) are not proper comparators.

Based on the evidence presented, Bryant is the only employee similarly situated to Dawson. It is undisputed that Dawson and Bryant were both salaried managers and that they were both terminated following the investigation of alleged sexual misconduct. Because Bryant did not receive "more favorable treatment," Dawson's claim of discriminatory discharge fails under the fourth prong of the prima facie case.[4] *Gerner*, 674 F.3d at 266; *see also Williams v. Gallup, Inc.*, 709 F. App'x 567, 570 (11th Cir. 2017) (holding that the employee "failed to establish a prima facie case of discrimination because the only similarly-situated comparator presented . . . was ultimately terminated a week after [the employee] for similar reasons").

### b.     Pretext

Even if Dawson could establish a prima facie case of discrimination, Kroger has clearly met its burden of articulating a legitimate, nondiscriminatory reason for terminating Dawson's employment. Consequently, the court must determine whether Dawson has presented sufficient evidence for a reasonable jury to find that the proffered reason for her termination— engaging in inappropriate sexual activity—"is actually a pretext for discrimination." *Hill*, 354 F.3d at 284–85. A plaintiff can establish pretext by showing that the employer's "explanation

---

[4] Contrary to Dawson's suggestion, the fact that Kroger fired both employees does not "help[] plaintiff's case" or "support [the] imposition of liability" under *Bostock*. (Pl.'s Br. in Opp'n 28–29.) The cited portion of the Supreme Court's decision simply explains that it is not "a defense for an employer to say it discriminates against both men and women because of sex," since Title VII "works to protect individuals of both sexes from discrimination." *Bostock*, 140 S. Ct. at 1741. The decision in no way suggests that an employer violates Title VII by terminating male and female supervisory employees accused of engaging in sexual misconduct in the workplace.

is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of . . . discrimination." *Mereish v. Walker*, 359 F.3d 300, 336 (4th Cir. 2004) (quoting *Burdine*, 450 U.S. at 256).

For the reasons discussed above, Dawson has not presented evidence from which a reasonable jury could find that Dawson's sex played a role in the decision to terminate her employment. Dawson once again relies on a selective recitation of Erin Haithcock's deposition testimony to support the notion that "sex made a difference between retention and discharge." (Pl.'s Br. Opp'n Summ. J. 30.) The cited testimony, however, does not "suggest discriminatory animus without resorting to speculation." *Takele*, 576 F.3d at 839. Likewise, Dawson cites no evidence to support the theory that "she was made to be a scapegoat for male employee wrongdoers." (Pl.'s Br. Opp'n Summ. J. 30.) It is well settled that a plaintiff "cannot rely upon mere speculation or the building of one inference upon another" to survive summary judgment under the pretext framework. *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016) (internal quotation marks and citations omitted).

Dawson has also failed to establish that Kroger's explanation for her termination is unworthy of credence. When reviewing an employer's articulated reason for an employment decision, the court "must keep in mind that Title VII is not a vehicle for substituting the judgment of a court for that of the employer." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298–99 (4th Cir. 1998) (internal quotation marks and citation omitted). In particular, the court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination . . . ." *Id.* (internal quotation marks and citation omitted). "Thus, when an employer articulates a reason for discharging the

29

plaintiff not forbidden by law, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Id.*; *see also Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007) ("In assessing pretext, a court's focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible.") (internal quotation marks and citation omitted).

Here, Dawson has, at most, presented testimony indicating that she and Bryant did not actually engage in inappropriate sexual activity in the supply room. She has not put forth any evidence from which a reasonable jury could find that Haithcock or any other HR official did not honestly believe Angle's allegations. Dawson's present efforts to disprove the allegations and impugn the credibility of coworkers interviewed during the HR investigation do not create a triable issue of pretext. *See Holland*, 487 F.3d at 217-18 (concluding that even if the plaintiff did not threaten his supervisor, the plaintiff did not come forward with evidence to show that his employer "did not honestly believe that the threats were made"); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128–29 (10th Cir. 1998) (holding that the plaintiff failed to establish pretext where the defendant discharged him after investigating and crediting allegations of sexual misconduct, even though the plaintiff presented evidence on summary judgment suggesting that the allegations may have been false); *Croft v. City of Roanoke*, 862 F. Supp. 2d 487, 498 (W.D. Va. 2012), *aff'd*, 2013 WL 264803 (4th Cir. 2013) (concluding that neither the plaintiff's denial of wrongdoing nor his emphasis on the absence of physical evidence was sufficient to raise a triable issue of fact as to the truth of the defendant's stated reason for its disciplinary decision). If Dawson "was fired for misconduct she did not actually engage in,

that is unfortunate, but a good-faith factual mistake is not the stuff of which Title VII violations are made." *Villa*, 858 F.3d at 903.

In sum, Dawson's claim of discriminatory discharge also fails to survive summary judgment under the *McDonnell Douglas* framework because Dawson has not shown that she was treated less favorably than a similarly-situated male employee or produced evidence that Kroger's proffered reason for her termination is pretextual. Thus, the court will grant Kroger's motion for summary judgment on Dawson's discriminatory discharge claim.

## B.   Hostile Work Environment

Dawson also claims that the "sex-based rumors about plaintiff sleeping her way to the top" created a hostile work environment. (Pl.'s Br. Opp'n Summ. J. 25; *see also* Compl. ¶ 24.) Kroger challenges this claim on multiple grounds. In response, Dawson simply argues that "the rumors were pervasive." (Pl.'s Br. Opp'n Summ. J. 25.)

Because the workplace environment is a term or condition of employment, Title VII creates a hostile work environment cause of action. *EEOC v. R&R Ventures*, 244 F.3d 3334, 338 (4th Cir. 2001). "A hostile work environment is one 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 207 (4th Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To survive summary judgment, a female plaintiff must produce evidence sufficient for a reasonable jury to find that "the offending conduct (1) was unwelcome, (2) was based on sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment

and create an abusive work environment, and (4) was imputable to her employer." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc).

Dawson's hostile work environment claim clearly fails for lack of evidence to establish the third element. This element has both subjective and objective components. *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 421 (4th Cir. 2014). Dawson "must show that [she] did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." *Id.* (alteration in original); *see also Harris*, 510 U.S. at 21–22 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive environment . . . is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.").

Here, there is simply no evidence that Dawson perceived her work environment to be hostile or abusive. Indeed, Dawson's own testimony establishes that she was unaware of the rumors regarding her relationship with Bryant until after the alleged supply-closet incident and that the rumors therefore did not have "any sort of adverse impact on [her] job duties" or her "job performance." (Dawson Dep. at 124:21–125:18.) Dawson further testified that she "enjoyed working at Kroger" and that she "wanted to keep working there . . . in spite of this rumor concerning [her] and Mr. Bryant and the nature of [her] promotion." (*Id.* at 205:21–206:18.) On this record, no reasonable jury could find that the rumors altered the conditions of Dawson's employment or created a subjectively hostile or abusive work environment.

Accordingly, the hostile work environment claim cannot survive summary judgment.[5]

## IV.   CONCLUSION

For the reasons stated above, Kroger's motion for summary judgment will be granted.

A separate order will be issued.

**ENTERED** this 24th day of June, 2021.


*/s Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[5] Dawson seems to have abandoned the allegation that Kroger continued to harass her following her termination by belatedly withdrawing its appeal from the award of unemployment benefits. In any event, "post-termination harassment" does "not constitute evidence of a hostile work environment." *Gilson v. Pa. State Police*, 175 F. Supp. 3d 528, 564 (W.D. Pa. 2016), *aff'd*, 676 F. App'x 130 (3d Cir. 2017); *see also Breauburn v. Thomas Jefferson Univ.*, 578 F. Supp. 2d 777, 784 (E.D. Pa. 2008) (noting that a particular comment was not relevant to the plaintiff's hostile work environment claim since "it was made after she was discharged").